Charles E. Wheeler, SBN 82915
Amanda M. Lorenz, SBN 264336
COZEN O'CONNOR
501 West Broadway, Suite 1610
San Diego, CA 92101
Telephone: 619.234.1700
Facsimile: 619.234.7831
cwheeler@cozen.com
alorenz@cozen.com

Attorneys for Plaintiff
ILLINOIS UNION INSURANCE COMPANY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| ILLINOIS UNION INSURANCE COMPANY, an Illinois corporation,<br><br>Plaintiff,<br><br>vs.<br><br>INTUITIVE SURGICAL, INC., a Delaware corporation,<br><br>Defendant. | Case No.:<br><br>**COMPLAINT FOR RESCISSION OF INSURANCE POLICY AND DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff ILLINOIS UNION INSURANCE COMPANY ("Plaintiff") alleges:

1. Plaintiff is an Illinois corporation with its principal place of business in Philadelphia, Pennsylvania.

2. Defendant INTUITIVE SURGICAL, INC. ("Defendant") is a Delaware corporation with its principal place of business in Sunnyvale, Santa Clara County, California.

3. <u>Jurisdiction.</u> This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4. Venue is proper in this Court because the Defendant is a resident of this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

5. <u>Intradistrict Assignment.</u> Pursuant to Local Rule 3-2(c) and (e), this action arises in the San Jose Division of this Court because a substantial part of the events or omissions which give rise to the claim occurred in Santa Clara County, California.

# FIRST CLAIM FOR RELIEF

### (Rescission of Insurance Policy)

6. This is an action pursuant to California Insurance Code § 650 to rescind Life Sciences Products-Completed Operations Liability Policy No. SPL G24369298 001 (the "Policy") issued by Plaintiff to Defendant. The Policy provides coverage for products liability claims first made against Defendant during the policy period, March 1, 2013 to March 1, 2014. The Policy provides $15,000,000 per occurrence and aggregate limits, including defense costs, over a $5,000,000 per occurrence and aggregate self-insured retention, including defense costs, which must be satisfied by Defendant before any coverage is provided by the Policy. Defendant can satisfy the self-insured retention by payment of defense costs as well as payment of settlements and judgments.

7. Defendant is a medical equipment manufacturer. Its only product line is *da Vinci* robotic surgical systems, which are used in a number of surgical procedures, including hysterectomies and prostatectomies. The system uses robotic arms with a variety of surgical tools such as retractors and cutting devices which are controlled remotely by a surgeon to perform microsurgery which is less invasive than open surgery and typically results in shorter healing periods. As of December 31, 2012, Intuitive had installed 2,585 *da Vinci* systems worldwide, including 1,878 in the United States. Defendant estimates that over 450,000 procedures were performed using *da Vinci* systems in 2012.

8. At all relevant times in connection with the application process for the Policy, Defendant was represented by an insurance broker, Woodruff-Sawyer & Co. ("Broker"), located in San Francisco, California. Pursuant to California Insurance Code section 33, Broker represented Defendant, and not Plaintiff, in the application process. Plaintiff had no direct communications, either oral or written, with Defendant during the application process.

9. On January 22, 2013, Broker emailed to Plaintiff a submission for Intuitive's products liability coverage renewal on March 1, 2013. At the time, Defendant's primary products liability insurance was provided by Ironshore Insurance ("Ironshore"). Broker informed Plaintiff that Defendant was looking for both primary and excess insurance options for $15,000,000 per occurrence and aggregate up to $50,000,000, and that the expiring Ironshore primary products liability insurance provided $15,000,000 per occurrence and aggregate limits over a $3,000,000 per

COMPLAINT FOR RESCISSION OF INSURANCE POLICY AND DECLARATORY RELIEF

occurrence, $5,000,000 aggregate self-insured retention. The Broker's submission attached an application for renewal coverage on an Ironshore form, and Excel spreadsheets showing three Field Actions (notice provide to users of *da Vinci* systems of corrective action that needs to be taken) in 2011 and MDR's (reports of complications or potential complications in surgeries using the *da Vinci* system) during 2012. The submission stated that loss runs would follow.

10.     On January 30, 2013, Plaintiff sent an email to the Broker stating that Plaintiff was interested in the risk and requesting loss runs. Later that day, Broker provided Plaintiff with insurer loss runs for annual policy periods starting on March 1, 2000, through the Ironshore policies for policy periods from March 1, 2011 through March 1, 2013. The loss run for the Ironshore policy showed 9 claims during the first policy period, March 1, 2011 to March 1, 2012, and 22 claims for the second policy period commencing on March 1, 2012. The Ironshore policies provided coverage for claims first made against Defendant during each policy period, irrespective of when the surgical procedure giving rise to the claim took place. Broker subsequently provided Plaintiff with three additional claims to be added to the Ironshore loss run for the last policy period commencing March 1, 2012, bringing the total reported claims to 25 during the second Ironshore policy period.

11.     Unbeknownst to Plaintiff, commencing no later than November, 2012, Defendant through their counsel entered into tolling agreements with several claimants' attorneys which provided that applicable statutes of limitations were tolled as to claimants who had contacted claimants' attorneys based on alleged complications from use of *da Vinci* systems to perform surgeries. Each claimant was added to the tolling agreements in lists provided by claimants' attorneys to Defendant's counsel. The tolling agreements contemplated exchanges of medical information and mediation before any litigation was filed.

12.     The existence of the tolling agreements and the number of claimants added to the tolling agreements were not disclosed to Plaintiff during the application process. The existence of the tolling agreements was first publicly disclosed by Defendant in its 10-Q Quarterly Report filed with the Securities and Exchange Commission ("SEC") on or about April 19, 2013. Defendant did not disclose the existence of the tolling agreements or the increasing number of claimants added to the tolling agreement in its 10-K Annual Report filed with the SEC on or about February 4, 2013, which only noted that Defendant "was aware of increasing efforts by plaintiff's attorneys to solicit *da Vinci* patients for product liability lawsuits against the Company. The Company cannot yet estimate the impact of these solicitations."

- 3 -

13. After March 1, 2013, many new claimants have been added to the tolling agreements, and mediations and settlements have taken place with some of those post-March 1 claimants. Plaintiff is informed and believes, and based thereon alleges, that Defendant asserts that Plaintiff's Policy covers all claimants added to the tolling agreement after March 1, 2013, after the applicable self-insured retention has been satisfied.

14. Plaintiff did not know of the existence of the tolling agreements prior to the issuance of the Policy, and had no means of learning of the existence of the tolling agreements and the increasing numbers of claimants being added to the tolling agreements because that information was known only to Defendant, Defendant's counsel, and the claimants' attorneys who were providing lists of claimants to be added to the tolling agreements directly to Defendant's counsel. Plaintiff is informed and believes, and based thereon alleges, that Defendant's national defense counsel and claimants' attorneys who were parties to the tolling agreements did not publicly disclose the existence of the tolling agreements prior to the disclosure by Defendant in its 10-Q Quarterly Report in April, 2013. Defendant is informed and believes, and based thereon alleges, that the total number of claimants added to tolling agreements has not been publicly disclosed by anyone through the present time.

15. The loss runs submitted by Broker to Plaintiff, including payments for those losses, were analyzed by an actuary as part of Plaintiff's underwriting process. Plaintiff used the actuarial analysis to determine both the appropriate attachment point of Plaintiff's coverage (*i.e.,* the amount of the applicable per occurrence and self-insured retention) and the appropriate premium to be charged. In particular, during the application process Broker requested quotes from Plaintiff based on a higher self-insured retentions than the expiring Ironshore policy, and the quote that was eventually accepted by Defendant increased the per occurrence self-insured retention from $3,000,000 to $5,000,000 while maintaining a $5,000,000 aggregate self-insured retention.

16. The existence of the tolling agreements and the increasing number of claimants added to the tolling agreements were facts that would have been material to Plaintiff's underwriting process that led to the binding of coverage and issuance of the Policy. The increasing number of claimants being added to tolling agreements that would likely continue into the new policy period commencing March 1, 2013, was a material change in the risk, because Plaintiff was relying on the small numbers of claims with minimal expenses shown on loss runs provided by the Broker, while the number of actual claimants was much larger and was increasing rapidly. In addition, any defense costs (and

- 4 -
COMPLAINT FOR RESCISSION OF INSURANCE POLICY AND DECLARATORY RELIEF

settlements) incurred with respect to tolling agreement claimants prior to the issuance of the Policy would have been material to the actuarial analysis.

17. Had Plaintiff been informed of the tolling agreements and increasing number of claimants during the application process, Plaintiff would not have proceeded with the application process and would have withdrawn any quote for the Policy provided to Broker, and the Policy would never have been issued to Defendant. Even if Plaintiff had been willing to consider providing products liability insurance to Defendant, the insurance would not have had the same attachment point or premium.

18. Part VI Conditions, Subsection K of the Policy states:

> K. Representations
>
> By accepting this Policy, "you" [Defendant] agree that:
>
> The statements in the Declarations, Application and "submission materials" for this Policy are accurate and complete;
>
> Those statements are based upon representations "you" made to the "us"; and
>
> This Policy has been issued in reliance upon "your" representations.

19. California Insurance Code §§ 330-335 provide:

> § 330. Concealment defined
>
> Neglect to communicate that which a party knows, and ought to communicate, is concealment.
>
> § 331. Effect of concealment
>
> Concealment, whether intentional or unintentional, entitles the injured party to rescind insurance.
>
> § 332. Required disclosure
>
> Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining.
>
> § 333. Required inquiry

- 5 -

> Neither party to a contract of insurance is bound to communicate information of the matters following, except in answer to the inquiries of the other:
>
> 1. those which the other knows.
>
> 2. Those which, in the exercise of ordinary care, the other ought to know, and of which the party has no reason to suppose him ignorant.
>
> 3. Those of which the other waives communication.
>
> 4. Those which prove or tend to prove the existence of a risk excluded by a warranty, and which are not otherwise material.
>
> 5. Those which relate to a risk excepted from insurance, and which are not otherwise material.
>
> § 334. Materiality
>
> Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries.
>
> § 335. Presumed knowledge
>
> Each party to a contract of insurance is bound to know:
>
> (a) All the general causes which are open to his inquiry equally with that of the other, and which may affect either the political or material perils contemplated.
>
> (b) All the general usages of trade.

20. Defendant was required to provide information to Plaintiff to allow Plaintiff to fairly evaluate the risk and to determine whether to quote, bind and issue the Policy.

21. As alleged in paragraphs 9 through 15 of this Complaint, in January and February, 2013, during the application and underwriting process leading to the issuance of the Policy, Defendant knew that Defendant's counsel had been entering into tolling agreements with increasing numbers of claimants who were not shown on loss runs provided to Plaintiff in connection with the application process, that the existence of such tolling agreements and the increasing number of claimants added to the tolling agreements would be a material fact to Plaintiff and its underwriters in

COMPLAINT FOR RESCISSION OF INSURANCE POLICY AND DECLARATORY RELIEF

determining whether to quote, bind and issue the Policy, and that Plaintiff and its underwriters had no reason to know of these tolling agreements because the existence of tolling agreements had not been publicly disclosed by anyone.

22. Plaintiff issued the Policy in reliance on Defendant's disclosure of all material facts that were not publicly available and unknown to Plaintiff. The material facts that were not publicly available and unknown to Plaintiff included the existence of tolling agreements with increasing numbers of claimants. Plaintiff is informed and believes, and based thereon alleges, that Defendant expected claimants first added to tolling agreements after March 1, 2013, would be covered by Plaintiff's Policy after satisfaction of the applicable self-insured retention, and Defendant knew or should have known that this expectation of coverage made the existence of tolling agreements and increasing numbers of claimants added to those tolling agreements would be a material fact for Plaintiff in determining whether to insure the risk.

23. Plaintiff also relied on the representation by Defendant in the Policy that "[t]he statements in the Declarations, Application and 'submission materials' for this Policy are accurate and complete." The Application and "submission materials" were not accurate and complete because they omitted any information on the existence of the tolling agreements and the increasing numbers of claimants being added to the tolling agreements. In particular, by offering to provide loss runs and then providing loss runs which did not include any of the claimants added to tolling agreements, the loss runs were incomplete and misleading.

24. Had Plaintiff known of the tolling agreements and increasing numbers of claimants being added to the tolling agreements during the application and underwriting process for the Policy, Plaintiff would not have quoted or agreed to issue the Policy or would have issued the policy on materially different terms.

25. California Insurance Code § 650 provides:

§ 650.  Time for exercising right

Whenever a right to rescind a contract of insurance is given to the insurer by any provision of this part such right may be exercised at any time previous to the commencement of an action on the contract. The rescission shall apply to all insureds under the contract, including additional insureds, unless the contract provides otherwise.

26. Pursuant to California Insurance Code § 331, Plaintiff is entitled to rescind the Policy based on Defendant's concealment of material facts, specifically the existence of tolling agreements starting in November, 2012, and the increasing number of claimants being added to the tolling agreements during January and February, 2013.

27. Based on Defendant's concealment of the existence of the tolling agreements and the increasing number of claimants added to the tolling agreements, Plaintiff is entitled to judicial rescission of the Policy. In the event rescission of the Policy is granted, Plaintiff will refund the premium paid to it in connection with the Policy to the Defendant.

## SECOND CLAIM FOR RELIEF

### (Declaratory Relief)

28. Plaintiff realleges Paragraphs 1 through 27 as though fully set forth.

29. There is an actual controversy between Plaintiff and Defendant with respect to coverage under the Policy for claims of claimants added to tolling agreements after the inception date of the Policy and suits filed against Defendant after the inception of the Policy.

30. Plaintiff is informed and believes, and based thereon alleges, that Defendant contends that there is coverage under the Policy for all claims of claimants added to tolling agreements after the inception date of the Policy and all suits filed against Defendant after the inception of the Policy after the applicable self-insured retentions have been satisfied.

31. Plaintiff contends that the Policy should be rescinded and that no coverage is provided by the Policy for claims of claimants added to tolling agreements after the inception date of

the Policy and all suits filed against Defendant after the inception of the Policy after the applicable self-insured retentions have been satisfied.

32. Defendant has not notified Plaintiff that the applicable self-insured retentions in the Policy have been satisfied as of the date of the filing of this Complaint.

33. Plaintiff is informed and believes, and based thereon alleges, that it is likely that the applicable self-insured retentions in the Policy will be satisfied by payment of defense costs and settlements of claims of claimants added to tolling agreements after the inception date of the Policy and suits filed against Defendant after the inception of the Policy, and that Defendant will demand that Plaintiff provide coverage for all defense costs, settlements and judgments for claims of claimants added to tolling agreements after the inception date of the Policy and all suits filed against Defendant after the inception of the Policy after satisfaction of the self-insured retention up to the applicable limits of the Policy.

34. Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaration that there is no coverage under the Policy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. On the First Claim for Relief for Rescission of Insurance Policy, for judgment granting rescission of the Policy.

2. On the Second Claim for Relief for Declaratory Relief, for a declaration that there is no coverage under the Policy.

3. For costs of suit incurred herein.

COMPLAINT FOR RESCISSION OF INSURANCE POLICY AND DECLARATORY RELIEF

4. For such other and further relief as this Court may deem just and proper.

DATED: October 21, 2013

COZEN O'CONNOR

By: _____
CHARLES E. WHEELER
AMANDA M. LORENZ
Attorneys for Plaintiff
ILLINOIS UNION INSURANCE COMPANY

COMPLAINT FOR RESCISSION OF INSURANCE POLICY AND DECLARATORY RELIEF

## DEMAND FOR JURY TRIAL

Plaintiff ILLINOIS UNION INSURANCE COMPANY demands a trial by jury on all claims which may be tried by jury pursuant to Rule 38(a) of the Federal Rules of Civil Procedure.

DATED: October 21, 2013  COZEN O'CONNOR

By: _/s/ Charles E. Wheeler_
CHARLES E. WHEELER
AMANDA M. LORENZ
Attorneys for Plaintiff
ILLINOIS UNION INSURANCE COMPANY

LEGAL\17475033\1

COMPLAINT FOR RESCISSION OF INSURANCE POLICY AND DECLARATORY RELIEF