UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ILLINOIS UNION INSURANCE COMPANY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>INTUITIVE SURGICAL, INC.,<br><br>Defendant. | Case No. 13-cv-04863-JST<br><br>**ORDER DENYING ILLINOIS UNIONS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Re: ECF No. 146 |

Plaintiff Illinois Unions Insurance Company ("Illinois Union") moves for partial summary judgment on its rescission claim. ECF No. 146. The Court will deny the motion.

I.  **BACKGROUND**

A.  **Procedural History**

On October 21, 2013, Illinois Union filed a complaint against Intuitive Surgical, Inc. ("Intuitive"), seeking to rescind a products liability insurance policy, which Illinois Union had issued to Intuitive. ECF No. 1.[1] On December 16, 2013, Navigators filed a complaint against Intuitive, seeking to rescind a separate products liability insurance policy, which Navigators had issued to Intuitive. Navigators Specialty Ins. Co. v. Intuitive Surgical, Inc., No. 15-cv-5801-JST, ECF No. 1 ("Navigators"). Both complaints sought to rescind the underlying insurance policies based on Intuitive's alleged concealment from Illinois Union and Navigators (collectively, the "Insurers") of certain tolling agreements which Intuitive had entered into with parties claimed to have been injured by Intuitive's *da Vinci* Surgical System product. ECF No. 1 ¶¶ 26–27; Navigators, No. 15-cv-5801-JST, ECF No. 1 ¶¶ 27–28. On April 23, 2014, the Court consolidated these two cases for all purposes other than trial, ECF No. 34, and on March 19, 2015, the Court set

---

[1] Unless otherwise indicated, all docket citations refer to the ECF docket in Illinois Union Ins. Co. v. Intuitive Surgical. Inc., No. 13-cv-4863-JST (filed Oct. 21, 2013).

the consolidated cases for trial on July 5, 2016.  ECF No. 61.

On October 20, 2015, Intuitive filed a separate action ("the breach of contract action"), alleging that Illinois Union and Navigators breached the insurance policies at issue in the rescission actions by failing to indemnify Intuitive for insured losses incurred in the defense and settlement of products liability claims brought against Intuitive in connection with its *da Vinci* Surgical System product.  Intuitive Surgical, Inc. v. Illinois Union Ins. Co., No. 15-cv-4834-JST, ECF No. 1.  The underlying policies in all three actions include two Illinois Union insurance policies (the "Illinois Union Policies") and one Navigators insurance policy (the "Navigators Policy").  Id. ¶¶ 2–3.  The Illinois Union Polices provide Intuitive with $15 million in products liability insurance coverage, subject to a $5 million limit for each occurrence and a $5 million aggregate self-insured retention for claims made between March 1, 2013 through March 1, 2014 (the "Policy Period").  Id. ¶ 2.  The Navigators Policy provides Intuitive with $10 million in excess products liability insurance coverage for claims made during the Policy Period.  Id. ¶ 3.

On October 29, 2015, the Court related Intuitive's breach of contract action to the rescission actions.  ECF No. 96.  On April 14, 2016, the Court issued a ruling, concluding that "Intuitive has a right to a jury trial on its breach of contract claim, which right requires the Court to schedule a jury trial on the breach of contract claim prior to a bench trial on the Insurers' rescission claims."  ECF No. 153 at 6.  As a result, the Court vacated the previously-scheduled trial date in the rescission actions.  Id. at 7.

On April 6, 2016, Illinois Union filed a motion for summary judgment in its rescission action, ECF No. 146, which motion the Court now considers.

### B.     Undisputed Facts

Intuitive is a medical equipment manufacturer based in Sunnyvale, California.  Intuitive's primary product line is the *da Vinci* Surgical System, a robotic surgical system, which is used by surgeons to perform minimally invasive surgical procedures.  Since at least February 26, 1997, Intuitive has purchased products liability insurance to protect against claims arising from use of its products.  From March 1, 2011 to March 1, 2013, Ironshore Insurance Company ("Ironshore") provided products liability insurance to Intuitive for the *da Vinci* Surgical System.

### 1. The Tolling Agreements

Beginning in late 2012, Intuitive authorized outside counsel to enter into "tolling agreements" with plaintiffs' attorneys for individuals who had contacted Intuitive regarding potential injury claims related to the *da Vinci* Surgery System. The tolling agreements took the form of letters from Intuitive's outside counsel to the plaintiffs' attorneys, stating that Intuitive agreed to "toll the applicable statute of limitations with regard to potential claims involving the *da Vinci* Surgical System by [the Claimant]" in exchange for the claimants' agreeing to, among other things, delay in filing suit. Intuitive's outside counsel retained a master chart listing each of the claims[2] involving the *da Vinci* Surgical System that were currently subject to the tolling agreements. Intuitive's Assistant General Counsel periodically received updates from outside counsel regarding which claims were currently subject to the tolling agreements.

As of December 31, 2012, the master chart listed 193 tolled claims. The number of tolled claims continued to grow throughout the winter and spring of 2013, reaching 328 tolled claims on January 31, 2013; 734 tolled claims on February 28, 2013; 864 tolled claims by late March; and 2,248 tolled claims by June 27, 2013.

On March 21, 2013, Intuitive notified Ironshore for the first time of the existence of the tolling agreements. The first public disclosure of any tolling agreements was made in Intuitive's April 19, 2013 Form 10-Q, filed with the SEC. That document stated: "Plaintiffs' attorneys are engaged in growing and well-funded national advertising campaigns soliciting clients who have undergone *da Vinci* surgery and claim to have suffered an injury. . . . In an effort to provide an orderly process for evaluating claims before they result in costly litigation, we have entered into tolling agreements with certain plaintiff's counsel acting on behalf of such claimants." The document did not indicate how many tolling agreements had been entered into and went on to explain that Intuitive "does not . . . know how many of such individuals will ultimately file lawsuits . . . ."

The parties dispute when Intuitive first disclosed the existence of the tolling agreements to

---

[2] Intuitive disputes that the names added to the tolling agreements were "claims," as opposed to "potential claims." ECF No. 144-6 at 19.

3

1   Illinois Union. Illinois Union claims that the initial disclosure occurred on May 23, 2013, during a
2   telephone call between Intuitive's assistant general counsel and Illinois Union's claims handler.
3   ECF No. 146 at 13. Intuitive asserts that it told Illinois Union about the tolling agreements in
4   March or early April 2013. ECF No. 144-6 at 4. In support of this contention, Intuitive submits
5   the deposition testimony of three Illinois Union underwriters who independently testified that they
6   first learned of the tolling agreements in late March or early April of 2013. All three underwriters
7   have subsequently filed deposition errata, claiming that they could not have learned about the
8   tolling agreements until at least May 23, 2013.

### 2. The Illinois Union Policy

On January 8, 2013, Intuitive emailed its insurance broker, Woodruff-Sawyer, an application to renew its products liability insurance with Ironshore. On January 22, 2013, Woodruff-Sawyer approached Illinois Union and requested a quote for products liability coverage for the period of March 1, 2013 to March 1, 2014 (the "Policy Period"). Woodruff-Sawyer submitted to Illinois Union the insurance application that had previously been submitted to Ironshore using Ironshore's application form.

Under the section entitled "Loss History", the application submitted to Illinois Union asked: "Are you aware of any incidents or circumstances involving or arising out of your products or operations which are likely to result in a claim." The application then stated: "If yes, please explain." In the application submitted to Illinois Union by Intuitive, the entire "Loss History" section was left blank.[3] Intuitive's insurance application also included a spreadsheet listing over 1,800 Medical Device Reports[4] ("MDRs") that had been submitted to the Food and Drug Administration ("FDA") in relation to Intuitive's products. The MDR's included 26 deaths, 168

---

[3] In Intuitive's January 8, 2013 email to Woodruff-Sawyer, attaching the Ironshore insurance application form, Intuitive indicated that it had left the Loss History section blank because Intuitive believed that Ironshore already had the requested information.

[4] According to the FDA, "Each year, [it] receives several hundred thousand medical device reports of suspected device-associated deaths, serious injuries and malfunctions. Medical Device Reporting (MDR) is one of the postmarket surveillance tools the FDA uses to monitor device performance, detect potential device-related safety issues, and contribute to benefit-risk assessments of these products." See U.S. Food and Drug Administration, Medical Devices Medical Device Reporting (MDR), *available at*: http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm.


1  incidents of device fragments falling into patients, and 1,342 incidents of device fragments
2  potentially falling into patients.
3        On January 30, 2013, Illinois Union emailed Woodruff-Sawyer, requesting loss runs for
4  Intuitive's previous insurers. Woodruff-Sawyer responded to Illinois Union, providing loss runs
5  for Intuitive's previous three insurers, covering a period of February 26, 1997 through March 1,
6  2013. These loss runs showed 60 total claims during that period, with 19 open claims and 3
7  closed claims during the second Ironshore coverage period (March 1, 2012 through March 1,
8  2013).
9        On February 1, 2013, Illinois Union requested an update from Woodruff-Sawyer regarding
10 open claims, as well as an updated loss history. On February 6, 2013, Illinois Union submitted an
11 insurance quote to Intuitive, noting that the quote was contingent on, among other things,
12 "[a]dditional information on the open claims noted on the Ironshore loss runs." On February 19,
13 2013, Woodruff-Sawyer provided Illinois Union with an updated list of 24 open products liability
14 claims, along with updated loss runs. None of the claimants listed on the tolling agreements were
15 listed on the list of 24 open products liability claims or on the loss runs.
16       On February 27, 2013, Illinois Union issued an insurance binder[5] to Intuitive, bearing
17 policy number G24369298001 and providing coverage for the period of March 1, 2013 through
18 March 1, 2014. On March 14, 2013, Illinois Union sent Woodruff-Sawyer an updated draft
19 policy. Woodruff-Sawyer responded on March 16, 2013, noting several discrepancies between the
20 March 14, 2013 draft policy and the terms which had been agreed to during the parties' prior
21 negotiations. On March 17, 2013, Illinois Union responded that it would "make the corrections
22 and re-send the policy." As of April 12, 2013, Illinois Union's internal electronic claims file
23 regarding the Intuitive policy indicated that "[t]he complete policy has not yet been issued as we
24 are waiting on manuscript endorsements."

---

[5] "[A] binder is an independent contract, separate and distinct from the permanent insurance policy. It is intended to give temporary protection pending the investigation of the risk by the insurer and until issuance of a formal policy or rejection of the insurance application by the insurer." Ahern v. Dillenback, 1 Cal. App. 4th 36, 48 (1991).

On April 16, 2013, Woodruff-Sawyer paid Illinois Union a premium on behalf of Intuitive. On April 29, 2013, Illinois Union issued to Intuitive a revised binder and insurance policy, bearing policy number G24369298001, and providing coverage from March 1, 2013 to March 1, 2014.

### C. Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. § 1332.  Plaintiff Illinois Union is an Illinois corporation with its principal place of business in Philadelphia, Pennsylvania.  Defendant Intuitive is a Delaware corporation with its principal place of business in Sunnyvale, California.

## II. LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by" citing to depositions, documents, affidavits, or other materials. Fed. R. Civ. P. 56(c)(1)(A). A party also may show that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986). A fact is "material" if the fact may affect the outcome of the case. Id. at 248. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).

Where the party moving for summary judgment would bear the burden of proof at trial, that party bears the initial burden of producing evidence that would entitle it to a directed verdict if uncontroverted at trial. See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc., 213 F.3d 474, 480 (9th Cir. 2000). Where the party moving for summary judgment would not bear the burden of proof at trial, that party bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claim, or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. If the moving party satisfies its initial burden of production, then the non-moving party must produce

6

admissible evidence to show that a genuine issue of material fact exists. See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102–03 (9th Cir. 2000). The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).  Indeed, it is not the duty of the district court to "to scour the record in search of a genuine issue of triable fact." Id.  "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some significant probative evidence tending to support the complaint." Summers v. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and internal quotation marks omitted).  If the non-moving party fails to make this showing, the moving party is entitled to summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

### III. ANALYSIS

#### A. Background Law

In California, "[t]he rule in insurance cases is that a material misrepresentation or concealment in an insurance application, whether intentional or unintentional, entitles the insurer to rescind the insurance policy *ab initio*." W. Coast Life Ins. Co. v. Ward, 132 Cal. App. 4th 181, 186–87 (2005).  "The rule has been codified in express provisions of the Insurance Code that place heavy burdens of disclosure upon both parties to a contract of insurance and permit rescission for a failure to provide requested information." Id. at 187.  Section 332 of the California Insurance Code provides: "Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining."

"Read in isolation, the duty [to disclose] appears quite broad—but it is subject to numerous qualifications." United Guar. Mortgage Indem. Co. v. Countrywide Fin. Corp., 660 F. Supp. 2d 1163, 1194 (C.D. Cal. 2009). California Insurance Code § 333, for instance, provides that "except in answer to the inquiries of the other," "[n]either party to a contract of insurance is bound to communicate[, among other things,] information . . . which the other [party] knows [or] which, in the exercise of ordinary care, the other ought to know, and of which the party has no reason to suppose him ignorant."  Further, California Insurance Code § 336 provides: "[t]he right

7

to information of material facts may be waived . . . (b) by neglect to make inquiries as to such facts, where they are distinctly implied in other facts of which information is communicated."

### B.     Concealment of the Tolling Agreements

Illinois Union argues that Intuitive "concealed the existence and number of tolling agreements from Illinois Union during the period when Illinois Union was underwriting the policy." ECF No. 146 at 19.  Because the tolling agreements were material, Illinois Union contends that it is entitled to rescind the underlying insurance policy.  Illinois Unions' argument is premised on its contention that concealment should be determined as of March 1, 2013, the effective date of the February 27, 2013 binder issued to Intuitive by Illinois Union.  See ECF No. 156 at 5.  Intuitive responds that a material dispute exists regarding concealment because "all three [of Illinois Unions'] underwriters on the Intuitive account testified that they learned about the tolling agreements in March or April of 2013."  According to Intuitive, concealment should be determined as of April 29, 2013, the date Illinois Union issued its revised policy.

The Court concludes that a material dispute exists regarding concealment of the tolling agreements.  First, the Court finds that concealment should be determined as of April 29, 2013, the date of issuance of the revised policy.  The February 27, 2013 binder provided: "Issuance by us of the policy shall render the binder void."[6]  Illinois Union issued the revised policy to Intuitive on April 29, 2013, thus rendering the February 27, 2013 binder void.  See Ahern v. Dillenback, 1 Cal. App. 4th 36, 48 (1991) ("[A] binder is an independent contract, separate and distinct from the permanent insurance policy.  It is intended to give temporary protection pending the investigation of the risk by the insurer and until issuance of a formal policy or rejection of the insurance application by the insurer."); id. at 49 (Once the policy issued, "the binder or temporary contract of insurance ceased to be effective.").  While the April 29, 2013 policy had an effective date of March 1, 2013, at least one Northern District of California district court applying California insurance law has found that "representations and warranties must be judged as of . . . the date the

---

[6] The February 27, 2013 binder also provided: "This proposal has been constructed in reliance on the data provided in the submission.  If there is a material change or misrepresentation of that data, we have the right to void this proposal."

8

policy was issued," not the effective date of the policy or the date a binder was issued. Butcher v. Gulf Ins. Co., No. 03-cv-3553-PJH, 2005 WL 1514086, at *10 (N.D. Cal. June 15, 2005). While the Butcher case is not citeable authority,[7] the Court agrees with its conclusion as applied to the facts here. Illinois Union cites no authority for its suggestion that concealment should be determined as of the date of the binder or the effective date of the policy.[8] Accordingly, the Court concludes that concealment should be determined as of April 29, 2013.[9]

        Second, the Court finds that a material dispute exists regarding whether Illinois Union had knowledge of the tolling agreements prior to April 29, 2013. All three of Illinois Union's underwriters involved in the Intuitive account initially testified during depositions that they first learned about the tolling agreements in March or April of 2013. While each of the underwriters subsequently submitted deposition errata indicating that they did not have knowledge of the tolling agreements until at least May 23, 2013, the discrepancy between these deponents' initial testimony and the deposition errata creates a factual dispute regarding when Illinois Union first learned about the tolling agreements. See Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 103 (2d Cir. 1997) ("[W]hen a party amends his testimony under Rule 30(e), the original answer to the deposition questions will remain part of the record and can be read at the trial.") (internal quotation marks omitted). Illinois Union offers no argument why the contradictory statements made separately by three of its underwriters does not create a material dispute as to when it first learned about the

---

[7] The Butcher opinion is the only case cited by either side on this question. That opinion was designated "NOT FOR CITATION" by the issuing court. See id. Local Rule 3-4(e) provides, "Any order or opinion that is designated: 'NOT FOR CITATION,' pursuant to Civil L.R. 7-14 or pursuant to a similar rule of any other issuing court, may not be cited to this Court, either in written submissions or oral argument, except when relevant under the doctrines of law of the case, res judicata or collateral estoppel." Civ. L.R. 3-4(e). Local Rule 7-14 provides, "It is within the sole discretion of the issuing Judge to determine whether an order or opinion issued by that Judge shall not be citable. Any order or opinion which the issuing Judge determines shall not be citable shall bear in the caption before the title of the Court 'NOT FOR CITATION.'" This Court is not relying on Butcher for its precedential value, and would have reached the same conclusion even in the absence of Butcher.

[8] In particular, Illinois Union offers no authority for its assertion that "[a]s a matter of law, materiality is measured as of the effective date of coverage, March 1, 2013, not when all the formalities of issuing a policy and collecting a premium are completed." ECF No. 156 at 5.

[9] As Intuitive notes, even if the correct date for determining the completeness of the disclosures was the date on which the insured paid its premium, a material dispute regarding concealment would still exist because Intuitive did not pay its premium until April 16, 2013. ECF No. 144-91 at 2.

9

tolling agreements.[10]

Alternatively, the Court concludes that summary judgment is inappropriate because the underwriters' contradictory deposition testimony creates a material dispute as to whether Illinois Union waived its right to rescind the policy. "An insurance company will be deemed to waive any ground which would otherwise entitle it to rescind a policy or treat it as forfeited when, despite knowledge of the facts giving it the option, it impliedly recognizes the continuing effect of the policy." DuBeck v. California Physicians' Serv., 234 Cal. App. 4th 1254, 1265 (2015). Here, Intuitive has presented evidence from which the trier of fact could conclude that Illinois Union "recognize[d] the continuing effect" of the insurance policy when it issued the April 27, 2013 revised policy, despite the fact that Illinois Union allegedly had knowledge of the existence of the tolling agreements prior to that date.[11]

---

[10] Rather, Illinois Union assumes away the existence of any factual dispute by asserting in its Reply Brief that "[i]t is undisputed that Illinois Union first learned that Intuitive had entered into hundreds of tolling agreements on May 23, 2013 . . . ." ECF No. 156 at 6.

[11] Although Illinois Union suggested at the hearing on this motion that it was required to issue a policy to Intuitive once the binder had issued, it cited no law for that proposition, and its position contradicts the language of the binder. ECF No. 143-10. The binder states:

> **Cancellation and Chances Applicable to Binders.** Prior to the effective date of the policy, either party may cancel the binder by sending written notice stating when cancellation will be effective. Issuance by us of the policy shall render the binder void. *If a material change in the risk occurs or a submission is made to us of a claim or circumstances that might give rise to a claim between the date of the binder indicated above and the Effective Date, we may cancel the binder or void the proposed insurance coverage ab initio ("from the beginning").*
>
> **Basis of This Binder.** Please read this **binder** carefully, as the limits, coverage and other terms and conditions may vary from those requested in your submission and/or from the expiring policy. Terms and conditions that are not specifically mentioned in this **binder** are not included. The terms and conditions of this **binder** supersede the submitted insurance specifications and all prior proposals and binders. Of course the actual coverage will be provided by and in accordance with the policy as issued. We are not bound by any statements made in the submission purporting to bind us unless such statements are reflected in the policy or in an agreement signed by someone authorized to bind us. *This **binder** has been constructed in reliance on the data provided in the submission. If there is a material change or misrepresentation of that data, we have the right to void this **binder**.* If we have misunderstood the coverage parameters you have outlined, please let us know.

Id. at 36. This language is consistent with a reasonably jury's ability to find that Illinois Union waived its right to rescind the policy when it issued that policy in April 2013.

1   Accordingly, the Court denies Illinois Union's motion for summary judgment.

## CONCLUSION

The Court concludes that a material dispute exists regarding whether Intuitive concealed the existence of the tolling agreements from Illinois Union prior to the issuance of the April 29, 2013 insurance policy.  The Court will therefore deny Illinois Union's motion for summary judgment.

IT IS SO ORDERED.

Dated:  May 27, 2016



JON S. TIGAR
United States District Judge